**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AURORA HOSPITALITY GROUP LLC, | ) | Case No. 22-12930 |
| | ) | |
| Debtor. | ) | Honorable LaShonda A. Hunt |
| | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASE OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Cache Private Capital Diversified Fund, LLC ("Cache"), hereby files this reply (the "Reply") in support of its *Motion to Dismiss Chapter 11 Case or, in the Alternative, Motion for Relief from the Automatic Stay* (the "Motion")[1] and in opposition to the *Response to Cache's Motion to Dismiss Chapter 11 Case or, in the Alternative, Motion for Relief from the Automatic Stay* (the "Response"). In support of the Reply, Cache respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Simply put, the Response fails to rebut any of the assertions in the Motion or to quell any of Cache's fears regarding the direction of this Chapter 11 Case. The Response fails to update the Court or Cache on the sales process, which is the most relevant piece of the Chapter 11 Case. Beyond that, the Debtor even agrees that most of the Tekena factors apply, but that each of the factors, *taken alone*, should not result in dismissal. Twelve of the fourteen Tekena factors apply and dismissal is therefore appropriate when looking at the "totality of the circumstances." In addition, the Debtor's valuation of the Property is speculative and far in excess of the likely fair

---

[1] Capitalized terms used but not defined in the Reply shall have the meaning given to such term in the Motion.

market value for vacant, unused land. Alternatively, it is appropriate for the Court to lift the automatic stay.

## REPLY

**A. The Response Fails to Update the Court or the Parties on the Sales Process**

2.     Unsurprisingly, the Debtor notes that its only plan in this Chapter 11 Case is to "sell the property as a fair market transaction, rather than at auction, to preserve and maximize equity in the property." Response at ¶ 20. However, despite a potential sale being the only plan, the Debtor fails to update the parties or the Court on the sales process.

3.     The State Court Case has been pending since February 9, 2021, nearly eleven months ago. At any time since that date, the Debtor could have refinanced the underlying Loan or made arrangements to sell the Property. The fact that no such progress has been made is truly telling of the Debtor's prospects to sell the Property.

4.     On November 1, 2022, the Debtor filed its *Emergency Motion to Stay the November 8, 2022 Judicial Sale* (the "Emergency Motion," attached hereto as Exhibit A), claiming to have a potential purchaser for the Property and attaching a letter of intent (the "Letter of Intent") to sell the Property for *$1.5 million*. It is unclear what the status is with that potential purchaser, but it is clear that the purchaser is not currently willing to purchase the Property for $1.5 million (and that the Debtor could not find anyone to execute a letter of intent at the time to purchase the Property for more). If such purchaser were available, presumably the Court would have been informed of this. The Debtor, who played games in the State Court Case by filing the Emergency Motion for a purchaser that is not currently in the mix, is currently playing games in this Court while it seeks more time to sell a Property at a valuation that is wholly speculative and unsupported (as set forth below).

2

5. Accordingly, the lack of information surrounding the sale of the Property is, by itself, grounds to dismiss the Chapter 11 Case, given the importance of the sale process to the Debtor's Chapter 11 Case.

**B. The Debtor does not Challenge the <u>Tekena</u> factors**

6. The Response does not dispute Cache's characterization of the <u>Tekena</u> factors, essentially agreeing that twelve of the factors apply. Rather, the Response notes that each of the <u>Tekena</u> factors *standing alone* is not cause for dismissal and argues that the "totality of the circumstances" should apply. <u>Response</u> at ¶ 18. If the "totality of the circumstances" were applied, twelve of the fourteen factors courts in this District use to determine whether a case was filed in "bad faith" are irrefutably present in the Chapter 11 Case. Moreover, the Chapter 11 Case is not even off the ground and there is seemingly no progress made with respect to the sale of the Property.

7. Instead, the Debtor argues that the alleged equity in the Property should be viewed as factor regarding dismissal. The fact that the Debtor believes there is some alleged equity in the Property does not give the Debtor *carte blanche* to market the Property at an unsupported value for eternity and does not preclude dismissal. In fact, the Debtor fails to cite a single case for this proposition.

**C. The Debtor Relies on a Valuation that is Unsupported and Overly Optimistic**

8. The Debtor is seeking to sell the Property for $3.7 million, despite previously having found a purchaser willing to buy the Property for only $1.5 million. The Debtor's valuation is overly optimistic[2] and the Appraisal itself is seriously flawed due to its lack of support for certain

---

[2] The Appraisal is dated July 2022 and real estate prices have undoubtedly dropped and are expected to drop well into 2023 as interest rates continue to rise and the economy slips into a recession. As one expert report has noted,

3

measures of the "as-is" value.

9. Cache's main issue with giving the Debtor more time to market and sell the Property is the fact that the Debtor is far overvaluing the Property and the appraisal (the "Appraisal") attached to the Response as Exhibit C is incredibly speculative and unsupported by facts—indeed, the Debtor's only potential purchaser from the State Court Case was willing to purchase the Property pursuant to the Letter of Intent for only $1.5 million.[3]

10. Notwithstanding the foregoing, there are serious issues with the Appraisal. The "as-is" valuation used by the Debtor is theoretical and unsupported. The Appraisal measures the "as-is" value of the Property as follows:

**FIGURE 13-2   "AS IS" VALUE CALCULATION**

| "As Is" Value Calculation | Amount |
|---|---|
| "When Complete" Prospective Value Opinion | $29,300,000 |
| Less Land Value | (2,100,000) |
| Less Cost Spent to Date | (816,000) |
| Less Entreprenuerial Incentive | (855,000) |
| Cost to Complete Construction and Open Property | 25,529,000 |
| "As Is" Value | $3,771,000 |
| Rounded to: | $3,800,000 |

Appraisal at p. 116. "As-Is" Valuation is thus a function of the "Land Value," "Cost Spent to Date," and "Entrepreneurial Incentive."[4]

11. Cache submits that "Land Value" is truly the best predictor of the market price of

---

"[h]igh interest rates and a recession will make 2023 a challenging year for commercial real estate." U.S. real estate market outlook 2023, CBRE, https://www.cbre.com/insights/books/us-real-estate-market-outlook-2023 (last visited Jan 2, 2023).

[3]   The Debtor likely seeks to sell the Property for far more than it is worth because the Debtor's principal, Kenneth Moore, personally guaranteed the $1 million unsecured debt in favor of Real Estate America LLC. The Schedules do not reflect this personal guaranty, however, Mr. Moore testified to this fact at the Debtor's section 341 meeting. The fact that this is one more error on the Debtor's Schedules further warrants dismissal. The Response also does not respond to the "bad faith" argument regarding the inaccuracy of the Debtor's Schedules.

[4]   Adding the three categories leads to the $3.77 million "as-is" valuation ($2,100,000 + $855,000 + $816,000 = $3,771,000).

the Property. Indeed, the Appraisal goes through three comparable sales and determines that the value of the land on which the Property sits is worth approximately $2.1 million based on the comparables. At this point, the Debtor is really only selling the land, given that the Property is vacant, unimproved land. And, again, the Debtor could not find a single purchaser willing to pay more than $1.5 million for the Property when it was desperate to do so.

12. The next issue is that "Cost Spent to Date" is completely unsupported in the Appraisal, and, in any event, is irrelevant to value. Why would a party take into account the amounts spent by the Debtor when valuing or choosing to purchase the Property? While there may be limited utility and benefit from certain costs that may have increased the value of the Property, the fact that the costs remain unsupported indicates that the benefit cannot be derived from a simple review of the Appraisal. Thus, "Costs Spent to Date" should be completely disregarded without any proof of the increased value as a result of such costs.

13. Lastly, entrepreneurial incentive is, as the Appraisal admits, a "theoretical appraisal concept," as defined below:

> Entrepreneurial incentive is a theoretical appraisal concept that represents the profit a developer would expect to earn on a development project. It is this expectation of profit, in addition to the actual cost, that motivates a developer to undertake a project. For most developers, this profit expectation is included in the projected overall yield resulting from the investment structure. As a result, entrepreneurial incentive is not typically identified as a budgeted item or specific dollar amount in developer's budgets. Based on our extensive review of development budgets and experience appraising proposed hotel properties, entrepreneurial incentive typically ranges from 0% to 10% of total project costs but may be up to 25% in some cases. In healthy markets with high barriers to entry, entrepreneurial incentive may not be in evidence, as developers may be motivated by the anticipated asset appreciation beyond the dates of completion and stabilization. On the other hand, developers may require a stronger anticipated return with an incentive at the high-end or above the typical range in markets with a higher risk of performance

5

volatility or competitive supply growth. In the case of the proposed subject property, an entrepreneurial incentive of 3.0% is warranted based on our analysis of the project and market conditions.

**FIGURE 12-7 ENTREPRENEURIAL INCENTIVE ESTIMATE**

| Item | Profit Percentage | Cost | Entrepreneurial Incentive |
|---|---|---|---|
| Building and Soft Costs | 3.0 % | $22,680,000 | $680,400 |
| Pre-Opening & Working Capital and Developer Fee | 3.0 | $1,320,000 | 39,600 |
| Furniture, Fixtures, & Equipment | 3.0 | 2,400,000 | 72,000 |
| Land Value | 3.0 | 2,100,000 | 63,000 |
| **Total Entrepreneurial Incentive** | | | **$855,000** |

Appraisal at p. 110.

14. "Entrepreneurial incentive" is essentially a theoretical percentage of the hypothetical cost of the project and is unsupported in the Appraisal and not something a purchaser would likely pay for the Property.

15. Simply put, the Debtor is selling vacant, unimproved land. The fact that the Debtor is insisting on selling the Property for $3.7 million based on the Appraisal is further reason the Chapter 11 Case must be dismissed—the Debtor is overly optimistic and insistent on selling the Property for far more than a willing purchaser would likely buy the Property for.[5] This is further evidenced by the fact that the Debtor had the ability to sell the Property for a very long time now and has failed to do so, and the Debtor's potential purchaser from the State Court Case was only willing to pay $1.5 million.

**D. In the Alternative, Lifting the Automatic Stay is Appropriate**

16. As a preliminary matter, Cache does not believe that this Court needs to even touch the lift stay issue. Dismissal is more than appropriate in this Chapter 11 Case and that the Debtor

---

[5] The Exclusive Listing Agreement [Docket No. 21-2] provides that the Debtor's broker shall list the Property at $3.7 million.

6

should not be given an opportunity to market the Property for any longer than it already has.

17. In addition, to the extent this Chapter 11 Case is not dismissed, Cache reserves its rights to obtain its own appraisal and/or to move toward an evidentiary hearing with respect to the request to lift the automatic stay, with respect to its request to lift the automatic stay for lack of equity in the property pursuant to section 362(d)(2) of the Bankruptcy Code.

18. With respect to Cache's request to lift the automatic stay pursuant to section 362(d)(3) of the Bankruptcy Code, the lifting of the automatic stay is appropriate. The Debtor filed an amended petition [Docket No. 26] indicating that the Chapter 11 Case is a single asset real estate case.[6] The Debtor therefore, within ninety days of the Petition Date, must either: (a) file a "plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time;" or (b) commence monthly payments that "are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate." 11 U.S.C. § 362(d)(3). The Debtor cannot confirm a plan of reorganization that seeks to sell the Property for at least $3.7 million <u>and</u> the Debtor has only $47.18 in the bank,[7] which is nowhere near enough to pay the interest on Cache's secured claim in the next thirty days. Simply put, the Debtor's Chapter 11 Case is going nowhere and dismissal or lifting the automatic stay is more than appropriate under the circumstances.

---

[6] In furtherance of the gamesmanship displayed by the Debtor, on December 28, 2022, the Debtor filed its second amended petition [Docket No. 26], changing its "business" back to single asset real estate, after initially filing the petition as a single asset real estate case [Docket No. 1] and then filing an amended petition [Docket No. 3] seeking to proceed under subchapter V of the Bankruptcy Code.

[7] See November Operating Report [Docket No. 25] at p. 2.

**WHEREFORE**, Cache respectfully requests that this Court enter an order granting the relief requested in the Motion and such further relief as may be equitable and just.

Dated:  January 4, 2023

Respectfully submitted,

**CACHE PRIVATE CAPITAL DIVERSIFIED FUND, LLC**

By:  /s/ Sean P. Williams
Elizabeth B. Vandesteeg, Esq.
Sean P. Williams, Esq.
**LEVENFELD PEARLSTEIN, LLC**
2 N. La Salle, Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
e-mail: evandesteeg@lplegal.com
e-mail: swilliams@lplegal.com

# EXHIBIT A

**IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
DUPAGE COUNTY - WHEATON, ILLINOIS**

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 20136310
2021CH000044
FILEDATE: 11/1/2022 8:22 PM
Date Submitted: 11/1/2022 8:22 PM
Date Accepted: 11/2/2022 2:15 PM
JW

| | |
|---|---|
| **CACHE PRIVATE CAPITAL DIVERSIFIED FUND, LLC** | |
| **PLAINTIFF,** | |
| VS. | CASE #  **2021 CH 0044** |
| **AURORA HOSPITALITY GROUP LLC, KENNETH MOORE, JANEE HOTEL CORPORATION, UNKNOWN OWNERS, AND NON-RECORD CLAIMANTS,** | PROPERTY: |
| **DEFENDANTS.** | |

**DEFENDANTS' EMERGENCY MOTION TO STAY THE NOVEMBER 8, 2022 JUDICIAL SALE**

NOW COMES Defendants, Aurora Hospitality Group, LLC, Kenneth Moore, and Janee Hotel Corporation, by and through their Attorney, RAI Law, LLC, and for their Emergency Motion to Stay the November 8, 2022 Judicial Sale state as follows:

This motion is being brought as an emergency because a judicial sale is scheduled for the property on November 8, 2022.

BACKGROUND

On April 25, 2019, Aurora Hospitality Group, LLC ("Aurora Hospitality") executed a mortgage to secure a commercial loan in the amount of $853,000 in favor of Plaintiff, Cache Private Capital Diversified Fund, LLC. The mortgaged property consisted of two parcels of vacant lots located at Route 59 (Lots 4 and 5) Drexel Avenue in Aurora, Illinois. Kenneth Moore, Aurora Hospitality's President, and Janee Hotel Corporation signed a Guaranty to guarantee payment and performance under the loan agreement. The loan had a maturity date of October 31, 2019.

On February 9, 2021, Plaintiff filed a complaint to foreclose on the subject mortgage and alleged that Aurora Hospitality had defaulted under the loan documents by failing to pay the entire

sum due and owing to Plaintiff by the maturity date. Throughout the course of the litigation, Defendants contested and challenged the amount Plaintiff claimed to be due and owing.

On July 21, 2022, the court granted Plaintiff's motion for summary judgment against defendants. On September 6, 2022, the court entered a judgment of foreclosure and sale in favor of Plaintiff in the amount of $1,499,076.07. On October 28, 2022, Defendants filed a motion to reconsider the court's orders which granted the Plaintiff's Motion for Summary Judgment and Judgment of Foreclosure. Defendants' motion to reconsider is scheduled for presentment on November 4, 2022.

Also, on October 28, 2022, the Borrower received a Letter of Intent from Route 59 Investment Properties, LLC ("Buyer") for the purchase the property. The Buyer has executed a Letter of Intent evidencing its desire to purchase the property for $1,500,000 and has provided proof of funds in the form of a commitment letter from Commercial City Mortgage Corporation in the amount of $1,750,000. (Attached hereto as Exhibit 1 are true and accurate copies of the Letter of Intent and the Proof of Funds).

The Letter of Intent contains a Due Diligence clause, wherein the Buyer will need to complete several tasks before the closing can occur. Therefore, the Defendants request that the sale be stayed for one hundred and twenty (120) days to allow the Buyer to perform the due diligence necessary to move forward with the purchase of the property. In consideration for the request to stay the sale for 120 days, the Defendants are willing to waive republication.

**ARGUMENT**

In *Wells Fargo Bank v. Simpson,* the court noted that it is in the best interest of the public to work out possible mortgage refinances rather than foreclose. *Wells Fargo Bank v. Simpson*, 2015 IL App (1st) 142925, ¶ 36. The *Simpson* court went on to explain that the Mortgage

Foreclosure Law establishes a careful balance between the lender's interest that a foreclosure case not be bogged down by formalistic proofs over noncontroversial matters, and a mortgagor's interest in preserving her property. The Mortgage Foreclosure Law affords the borrowers the opportunity to rescue their properties out of the foreclosure process. *Simpson*, 2015 IL App (1st) 142925, ¶ 45.

Here, the Defendants have secured a Letter of Intent to purchase from a Buyer interested in purchasing the property and has provided proof of adequate financing. Therefore, it is in the best interest of all parties that the judicial sale be stayed to allow the Defendants to complete the sale of the property. Additionally, given the fact that it is in the best interest of the public to work out possible alternatives to foreclosure (*Wells Fargo Bank v. Simpson*, 2015 IL App (1st) 142925, ¶ 36), the Defendants request that this Honorable Court stays the judicial sale.

WHEREFORE, the Defendants pray that this Honorable Court stays the judicial sale of the property scheduled for November 8, 2022, in order to allow the Defendants the opportunity to sell the property.

        Respectfully Submitted,

        By: */s/Giovanni Raimondi*
           Counsel for Defendants

RAI Law, LLC
20 N. Clark Street, 30th Floor
Chicago, IL 60602
(312) 857-8320
Email: pleadings@railawllc.com
Attorney #: 324817

# EXHIBIT 1

# LETTER OF INTENT

**October 28, 2022**

*VIA EMAIL*
ryan@taurusmodal.com

**This letter of intent ("*LOI*") sets forth the basic terms upon which <u>Route 59 Investment Properties LLC, its affiliates or assigns</u> ("*Buyer*") is interested in the property owned by the Sellers <u>Aurora Hospitality Group, LLC its affiliates or assigns</u> ("*Seller*") for the purchase and sale of the Property as such terms are defined below.**

**The basic terms are as follows:**

| | |
|---|---|
| ***Seller:*** | Aurora Hospitality Group, LLC |
| ***Buyer:*** | Route 59 Investment Properties, LLC |
| Subject ***Property:*** | 716 N. State Route 59 Drexel Avenue Aurora, IL 60504, 3.22 Acres |
| ***Purchase Price and Options :*** | One Million Five Hundred Thousand ($1,500,000.00) Dollars "As Is". Seller shall have the exclusive right for one year with two six month options to purchase the property back from Buyer for $1,500,000 plus interest at the rate of 12% and any additional customary closing cost. |
| ***Due Diligence;*** | Buyer understands that Buyer shall rely entirely upon its own due diligence in completing the purchase. Buyer shall be afforded until the date (the ***"Diligence Expiration Date"***) that is Sixty (60) Days after Buyer's execution of the Purchase & Sale Agreement (the **PSA**) to complete its inspections of the Property and undertake all due diligence. The Seller shall make no warranties as to the status of the Property, the improvements thereon, potential use, economic feasibility, environmental matters, the availability of development rights or permits or any other matters. Seller shall provide Buyer with all third party reports related to the property, including Appraisals, Phase One Environmental, Wetlands, Title Reports, City of Aurora Approvals and any other material fact and information related to the property. Seller will not incur any obligations that extend beyond the Closing. Buyer and its consultants, assigns or affiliates shall perform a |

|  |  |
|---|---|
|  | in-depth review of the property, At any point prior to the end of the Due Diligence period Buyer may waive the Due Diligence Period and terminate the Purchase Agreement. If Purchaser terminates the Purchase Agreement Purchaser shall be entitled to a full refund of the Earnest Money. Buyer understands the property is being sold "as is is. |
| ***Closing:*** | Closing shall occur on the date that is within Sixty (60) Days after the Diligence Expiration Date. |
| ***Deposit:*** | Buyer will deposit Ten Thousand Dollars ($10,000.00) (the "Initial Deposit") with Chicagoland Law Group as the Escrow Agent upon execution of the Purchase and Sales Agreement (PSA).  If Buyer is not satisfied with the Property, the Buyer may terminate the Purchase and Sale Agreement at any time prior to or on the Diligence Expiration Date and receive a full refund of the Initial Deposit. If Buyer does not terminate the Purchase and Sale Agreement prior to or on the Diligence Expiration Date the Initial Deposit shall become non-refundable. |
| ***Prorations; Expenses:*** | Taxes and other customarily apportioned items shall be prorated or apportioned as of Closing.  Buyer shall pay all costs of recording, all documentary stamp taxes, surtaxes, transfer taxes and recording taxes, the cost of any survey obtained by Buyer, and the owner's title insurance premium for the title insurance policy issued to be delivered by Seller to Buyer at closing.  Each party shall bear its own attorneys' fees and costs. |
| ***Conveyance:*** | The Property shall be conveyed by Seller as customary form of deed in Illinois subject to conditions, restrictions, easements and limitations of record.  Both the Buyer and Seller agree to use Greater Illinois Title Company for the closing of title for this transaction. |
| ***Brokerage:*** | Buyer represents that it has dealt with no broker or finder in connection with the Property. |
| ***Confidentiality:*** | Buyer and Seller agree from and after the execution of the Letter Of Intent, and continuing beyond the expiration or termination of this LOI or Purchase and Sales Agreement, the parties agree to maintain strict confidentiality of all information obtained by either party from the other and to not use or disclose the same for any purpose other than the contemplated by this Letter of Intent. Upon the termination of this Letter of Intent or any formal Purchase and Sale Agreement for any reason, the Buyer shall promptly return to Seller any and all |

|  |  |
|---|---|
|  | information and documentation, of any and every type, and in any form whatsoever, obtained from the Seller or its representatives in connection with the matters contemplated herein. Further, neither the Buyer nor the Seller shall, without the prior written consent of the other, disclose to the public or any third party any information concerning this Letter of Intent. |
| ***Proof of Funds:*** | Buyer agrees to provide a Proof of Funds or any other substantial financial instrument to make the purchase satisfactory to both the Buyer and Seller. If necessary, the Financing Contingency Period shall run concurrently with the Due Diligence Period. |
| ***Not a Commitment:*** | Except for this section, the section captioned "Deposit" and the section captioned "Confidentiality" set forth above (all of which are legally binding obligations given for good consideration had and received), this LOI does not purport to be and does not constitute a binding agreement among the parties, and the parties hereto shall have no obligations whatsoever expressed or implied, written or oral, with regard to the LOI.  This LOI is for discussion purposes only and does not in any way whatsoever constitute a commitment to sell, and Seller has made any commitments or agreements whatsoever, expressed or implied, written or oral, to Purchaser with regard to any of the matters covered by this LOI.  Notwithstanding anything to the contrary in this LOI or otherwise, the parties shall have a duty to negotiate in good faith and the parties may elect in their sole and absolute discretion not to enter into the Purchase and Sale Agreement.  The terms of this LOI are not all-inclusive and should not be construed as to reflect all of the provisions to be included in the Purchase and Sale Agreement and may be varied as the parties may determine in their sole and absolute discretion. |

**If Seller elects to negotiate a Purchase and Sale Agreement with Buyer based on this letter of intent, and so notifies Buyer in writing, Buyer understands that Seller (or its counsel) shall then deliver to Buyer a draft Purchase and Sale Agreement.  Furthermore, no prior or subsequent correspondence or course of dealing between Buyer and Seller shall be construed to create any contract or to vest any rights in Buyer with respect to the Property.  No contract shall be deemed to exist, neither Buyer nor Seller shall have any rights or obligations to each other in respect of the Property, nor shall Buyer have any rights with respect to the Property,**

**unless and until a Purchase and Sale Agreement document containing all terms and provisions is prepared, executed and delivered by all necessary parties.**

**Please acknowledge your acceptance of the terms of this LOI by executing a copy of this letter.**

|  | **Seller** | **Buyer** |
|---|---|---|
| By: | *Kenneth Moore* (DocuSigned) | *Andreas Eb* (DocuSigned) |
| Name: | Kenneth Moore | Andreas Eb |
| Company Name: | Aurora Hospitality Group, LLC | Route 59 Investment Properties, LLC |
| Address: | 716-724 N. State Route 59<br>Aurora, IL 60504 | 3828 W. Sherwin Avenue<br>Lincolnwood, IL 60712 |
| Telephone: | 630-499-9744 | 847-302-5061 |
| Fax: | | |
| Email: | ahgllc@outlook.com | Andreas.rt59properties@gmail.com |



**COMMERCIAL MORTGAGE CITY CORPORATION**
22860 Harrow Wood Court
Boca Raton, FL 33433
Tel: 561.488.4830

October 31, 2022

Mr. Andreas Eb
Route 59 Investment Properties, LLC.
3828 W Sherwin Avenue
Lincolnwood, IL 60712

Commercial Mortgage City Corporation and its investors, represented by Jeffrey Lustbader, have allocated $1,750,000.00 (One Million Seven Hundred Fifty Thousand USD) to Route 59 Investment Properties, LLC. represented by Andreas Eb for investment in real estate and other related working capital requirements. The funds are readily verifiable and are held in cash or brokerage accounts at Wells Fargo Bank and Fidelity Investments.

This Proof of Funds is solely for the benefit of Route 59 Investment Properties, LLC. and is not transferable to any other person or entity. This letter expires 90 calendar days after issue.

We further confirm that these funds on deposit are legally earned, good, clean, cleared funds of non-criminal origin and are free of any liens or encumbrances.

Sincerely,

*Jeffrey Lustbader*

Jeffrey Lustbader
President